Jennifer Chang Newell (SBN 233033)
jnewell@aclu.org
Katrina L. Eiland (SBN 275701)
keiland@aclu.org
ACLU FOUNDATION
IMMIGRANTS' RIGHTS PROJECT
39 Drumm Street
San Francisco, CA 94111
Telephone: (415) 343-0770
Facsimile: (415) 395-0950

Michael K. T. Tan*
mtan@aclu.org
David Hausman*
dhausman@aclu.org
ACLU FOUNDATION
IMMIGRANTS' RIGHTS PROJECT
125 Broad Street, 18th Floor
New York, NY 10004
Telephone: (212) 549-2660
Facsimile: (212) 549-2654

*Attorneys for Plaintiffs* (Additional counsel listed on following page)

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA
## EASTERN DIVISION

| | |
|---|---|
| INLAND EMPIRE – IMMIGRANT YOUTH COLLECTIVE and JESUS ALONSO ARREOLA ROBLES on behalf of himself and others similarly situated,<br><br>    Plaintiffs,<br><br>    v.<br><br>ELAINE C. DUKE, Acting Secretary, U.S. Department of Homeland Security; JAMES McCAMENT, Acting Director, U.S. Citizenship and Immigration Services; MARK J. HAZUDA, Director, Nebraska Service Center, U.S. Citizenship and Immigration Services; SUSAN M. CURDA, Los Angeles District Director, U.S. Citizenship and Immigration Services; THOMAS D. HOMAN, Acting Director, U.S. Immigration and Customs Enforcement; DAVID MARIN, Los Angeles Field Office Director, U.S. Immigration and Customs Enforcement; KEVIN K. McALEENAN, Acting Commissioner, U.S. Customs and Border Protection,<br>    Defendants. | Case No. 5:17-cv-2048<br><br>**CLASS ACTION COMPLAINT** |

Ahilan T. Arulanantham (SBN 237841)
aarulanantham@aclusocal.org
Dae Keun Kwon (SBN 313155)
akwon@aclusocal.org
ACLU FOUNDATION OF SOUTHERN CALIFORNIA
1313 West 8th Street
Los Angeles, CA  90017
Telephone: (213) 977-5232
Facsimile: (213) 977-5297

*Attorneys for Plaintiffs*

* *pro hac vice* application forthcoming

# **INTRODUCTION**

1.      President Trump has said that "dreamers should rest easy,"[1] yet his administration has placed these young immigrants, who came to the United States as children, directly at risk. Since 2012, the federal government's Deferred Action for Childhood Arrivals ("DACA") program has provided temporary protection from deportation (known as "deferred action") and authorization to work in the United States for nearly 800,000 young immigrants.[2] Now, not only is President Trump sunsetting the protections provided to these immigrant youth under DACA, but his Administration is eroding the strength of those protections even while the program winds down. On his watch, federal immigration authorities have targeted numerous DACA recipients and unlawfully revoked the grants of deferred action and work permits they have received, without any notice or opportunity to be heard, even though these individuals have abided by all the program rules and have not engaged in any conduct that would disqualify them from the program. This lawsuit challenges these unlawful revocation practices.

2.      For over half a decade, the DACA program has provided permission to live and work in the United States for these young people who have known no other country as home. The DACA program has allowed these talented young immigrants to come out of the shadows, obtain higher education, begin their careers, and contribute more fully to their communities. To establish eligibility for the program, DACA recipients must undergo extensive background checks, in addition to meeting multiple other stringent

---

[1] Transcript of AP Interview with President Trump, Associated Press, Apr. 23, 2017, https://apnews.com/c810d7de280a47e88848b0ac74690c83.

[2] *See* U.S. Citizenship & Immigration Servs., Number of I-821D, Consideration of Deferred Action for Childhood Arrivals by Fiscal Year, Quarter, Intake, Biometrics and Case Status: Fiscal Year 2012-2017 (June 30, 2017), https://www.uscis.gov/sites/default/files/USCIS/Resources/Reports%20and%20Studies/Immigration%20Forms%20Data/All%20Form%20Types/DACA/daca_performance data_fy2017_qtr3.pdf.

criteria. Noncitizens granted DACA are eligible to receive employment authorization and a Social Security Number.[3]

3. As former President Obama explained when first announcing the DACA program, these young people "are Americans in their heart, in their minds, in every single way but one: on paper."[4] President Obama recognized that "it makes no sense" to deport these "young people who study in our schools, . . . play in our neighborhoods, [are] friends with our kids, [and] pledge allegiance to our flag."[5]

4. Despite the critically important interests at stake once an individual has received a grant of DACA, the U.S. Department of Homeland Security ("DHS") has a practice of unlawfully and arbitrarily revoking DACA grants and work authorization based (apparently) on alleged conduct or minor criminal history that does not disqualify the individual from the program—including mere arrests or charges that are later resolved in the individual's favor. DHS terminates DACA in such cases without any advance notice, any chance to be heard, or any opportunity for reinstatement once the individual is cleared. As a result, many young noncitizens who grew up in this country have had their permission to remain and ability to work stripped away from them, instantaneously losing their ability to support themselves and their families, even though they have done nothing to change their eligibility for DACA.

5. Because of the government's unlawful practices, other young immigrants across the country are at likewise at risk of wrongfully losing their DACA protections.

---

[3] *See Frequently Asked Questions, DHS DACA FAQs*, U.S. Citizenship & Immigration Servs., https://www.uscis.gov/humanitarian/consideration-deferred-action-childhood-arrivals-process/frequently-asked-questions [https://www.uscis.gov/archive/frequently-asked-questions] (hereinafter "USCIS DACA FAQs").

[4] President Barack Obama, Remarks on Immigration Reform and Exchange with Reporters, 2012 DAILY COMP. PRES. DOC. 1 (June 15, 2012), https://obamawhitehouse.archives.gov/the-press-office/2012/06/15/remarks-president-immigration.

[5] *Id.*

6.     Plaintiff Inland Empire – Immigrant Youth Collective ("IEIYC") is a grassroots organization based in Ontario, California, that serves the immigrant community in the Inland Empire region by engaging in outreach and advocacy. IEIYC has multiple members whose lives have been changed by DACA, which has made it possible for them to pursue their education and careers, contribute to their communities, and achieve economic stability. Like hundreds of thousands of other immigrants, IEIYC's members have relied on the promises made by the federal government in the DACA program. However, because of the government's arbitrary revocation practices, IEIYC's members fear that their DACA grants and work permits could be terminated without notice or process.

7.     Plaintiff Jesús Alonso Arreola Robles is a 23-year-old resident of the Los Angeles area whose DACA grant and work permit was terminated without any process. He has known the United States as his only home since he was just one year old. DHS found him eligible for and granted him DACA in 2012, 2014, and again in 2016. At the time that DHS terminated his DACA, Mr. Arreola was working two jobs to help support his family—one as a cook at the famed Chateau Marmont in West Hollywood, and one as a driver for Uber and Lyft. Mr. Arreola's earnings helped support his parents, both of whom are lawful permanent residents, and his three U.S. citizen sisters—one of whom has significant disabilities.

8.     Despite his valid DACA grant and lack of any criminal history, federal immigration authorities arrested Mr. Arreola in February 2017 while he was driving a customer; falsely alleged that he was trying to help his customer smuggle people into the United States; and placed him in removal proceedings. Even though an immigration judge promptly rejected the smuggling allegation, and he was never charged with any crime, DHS nonetheless revoked his DACA grant and employment authorization.

9.     Mr. Arreola is just one of many young immigrants who have had their DACA abruptly and unlawfully cut off.

3

10.    The government's practice of terminating DACA without process, apparently based on unsubstantiated allegations or minor criminal history, even though the individual has never engaged in any disqualifying conduct, violates the federal Administrative Procedure Act ("APA") and the Due Process Clause of the Fifth Amendment to the U.S. Constitution. IEIYC and Mr. Arreola, on behalf of himself and a nationwide class of others similarly situated, respectfully request that this Court: declare the government's revocation practices unlawful; order that the government vacate and enjoin the revocation of Mr. Arreola's DACA grant and employment authorization, as well as those of class members who have suffered unlawful revocation or, in the alternative, temporarily reinstate their DACA grants and employment authorization pending the provision of a fair procedure to challenge the termination of their DACA grants consistent with the APA and Due Process Clause; order the government to accept renewal applications from Mr. Arreola and class members; and enjoin the government from revoking DACA grants and work authorization pursuant to its unlawful policies and practices in the future.

## JURISDICTION AND VENUE

11.    Jurisdiction is proper under 28 U.S.C. §§ 1331 and 1343, and the APA, 5 U.S.C. § 702.

12.    Declaratory and injunctive relief are available pursuant to 28 U.S.C. §§ 2201-2202 and the APA, 5 U.S.C. §§ 702-703.

13.    Venue is proper in this Court under 28 U.S.C. § 1391(e) because Defendants Elaine C. Duke, James McCament, Mark J. Hazuda, Susan M. Curda, Thomas D. Homan, David Marin, and Kevin K. McAleenan are Officers of the United States acting in their official capacities, and DHS, U.S. Citizenship and Immigration Services ("USCIS"), U.S. Immigration and Customs Enforcement ("ICE"), and U.S. Customs and Border Protection ("CBP") are agencies of the United States. Additionally, Mr. Arreola and IEIYC reside in this judicial district.

14.    IEIYC resides in the Eastern Division of this judicial district.

4

**PARTIES**

15.     Plaintiff Inland Empire – Immigrant Youth Collective is a grassroots, immigrant youth-led organization located in Ontario, California. Since 2010, the organization has served the undocumented immigrant community in the Inland Empire and has sought to empower those most impacted by immigration policy through outreach and policy advocacy. The majority of IEIYC's active membership are current DACA recipients who depend on having DACA to attend school, build their careers, and participate in IEIYC's work throughout Riverside and San Bernardino Counties.

16.     Plaintiff Jesús Alonso Arreola Robles is a 23-year-old resident of the Los Angeles area. He was brought to the United States from Mexico in 1995, when he was one year old, and has lived in the United States ever since. From August 2012 to February 2017, federal immigration authorities granted Mr. Arreola permission to live and work in the United States pursuant to the DACA program. In February 2017, however, Defendants terminated his DACA grant and employment authorization without notice or an opportunity to be heard, and without any opportunity for reinstatement.

17.     Defendant Elaine C. Duke is sued in her official capacity as the Acting Secretary of DHS. DHS is a cabinet department of the United States federal government with responsibility for, among other things, administering and enforcing the nation's immigration laws. As Acting DHS Secretary, Ms. Duke is responsible for the administration and enforcement of the immigration laws of the United States.

18.     Defendant James McCament is sued in his official capacity as Acting Director of USCIS, a federal agency that is part of DHS. USCIS is responsible for the implementation of the immigration laws of the United States, and administers the DACA program, including by processing applications and issuing notices of termination. As Director of USCIS, Defendant McCament is responsible for the

administration of USCIS and the implementation of the immigration laws of the United States.

19.     Defendant Mark J. Hazuda is sued in his official capacity as Director of the USCIS Nebraska Service Center. As Director of the Nebraska Service Center, Mr. Hazuda is responsible for the administration of the USCIS Nebraska Service Center and the decisions that it issues.

20.     Defendant Susan M. Curda is sued in her official capacity as the District Director of the Los Angeles District Office of USCIS. As District Director, Ms. Curda is responsible for the administration of the Los Angeles District Office and the decisions that it issues.

21.     Defendant Thomas D. Homan is sued in his official capacity as Acting Director of ICE, a law enforcement agency that is part of DHS. ICE is responsible for the apprehension, detention, and removal of noncitizens from the interior of the United States. In this position, Mr. Homan is responsible for the overall administration of ICE and the operation of ICE's immigration enforcement and detention activities.

22.     Defendant David Marin is sued in his official capacity as the Field Office Director for the Los Angeles Field Office of ICE. As Field Office Director, Mr. Marin is responsible for the administration of the Los Angeles Field Office and operation of the office's immigration enforcement and detention activities.

23.     Defendant Kevin K. McAleenan is sued in his official capacity as Acting Commissioner of CBP, a law enforcement agency that is part of DHS. CBP is responsible for border security and the apprehension, detention, and removal of noncitizens from the United States. As Acting Commissioner, he is responsible for the overall administration of CBP and the operation of its immigration enforcement and detention activities.

## BACKGROUND

**The DACA Program**

24.     On June 15, 2012, then-DHS Secretary of Homeland Security Janet Napolitano issued a memorandum establishing the DACA program (the "2012 DACA Memorandum").[6] Under the DACA framework, individuals who were brought to the United States as children and meet certain specific criteria may request deferred action for a renewable period of two years. In exchange, DACA applicants are required to provide the government with highly sensitive personal information, submit to a rigorous background check, and pay a considerable fee.

25.     The 2012 DACA Memorandum explained that DACA covers "certain young people who were brought to this country as children and know only this country as home" and that the immigration laws are not "designed to remove productive young people to countries where they may not have lived or even speak the language."[7]

26.     The 2012 DACA Memorandum established the following criteria for individuals to be eligible for DACA. The applicant must:

- have come to the United States before the age of sixteen;
- have resided continuously in the United States for at least five years preceding the date of the memorandum and been present in the United States on the date of the memorandum;
- be currently in school, have graduated from high school, have obtained a general education development certificate, or be an honorably discharged veteran of the Coast Guard or Armed Forces of the United States;

---

[6] Memorandum from Secretary Janet Napolitano, Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children (June 15, 2012), https://www.dhs.gov/xlibrary/assets/s1-exercising-prosecutorial-discretion-individuals-who-came-to-us-as-children.pdf (hereinafter "2012 DACA Memorandum").
[7] *Id.*

7

- have not been convicted of a felony offense, a significant misdemeanor offense, or multiple misdemeanor offenses;

- not otherwise pose a threat to national security or public safety; and

- not be above the age of thirty as of June 15, 2012.[8]

27. USCIS describes DACA as a form of deferred action, "a discretionary determination to defer a removal action of an individual as an act of prosecutorial discretion . . . . An individual who has received deferred action is authorized by DHS to be present in the United States, and is therefore considered by DHS to be lawfully present during the period deferred action is in effect."[9]

28. Because of the possibility that many DACA-eligible individuals might be reluctant to voluntarily disclose information that could help facilitate their removal from the United States, DHS repeatedly promised applicants that the information they provided as part of the DACA application process would "not later be used for immigration enforcement purposes."[10]

29. To apply for DACA, applicants must submit extensive documentation establishing that they meet the above-mentioned criteria.[11]

30. Applicants must submit a Form I-765 Application for Employment Authorization, and pay hundreds of dollars in fees.[12] If work authorization is granted, DACA recipients are issued federal employment authorization documents ("EADs"), and can apply for a Social Security Number.

31. DACA applicants must also undergo biometric and biographic background checks. When conducting these checks, DHS reviews the applicant's biometric and

---

[8] *Id.*
[9] USCIS DACA FAQs, Question 1.
[10] Letter from Secretary Jeh Charles Johnson to Rep. Judy Chu (Dec. 30, 2016), https://chu.house.gov/sites/chu.house.gov/files/documents/DHS.Signed%20Response%20to%20Chu%2012.30.16.pdf.
[11] USCIS DACA FAQs, Questions 28–41.
[12] USCIS DACA FAQs, Question 7.

biographic information "against a variety of databases maintained by DHS and other federal government agencies."[13] If any information "indicates that [the applicant's] presence in the United States threatens public safety or national security," the applicant will be ineligible for DACA absent "exceptional circumstances."[14] Under the DACA program, deferred action is available for a period of two years, subject to renewal.

32.     A decision to grant or deny a DACA application or renewal is separate and independent from any removal proceedings in immigration court. A noncitizen who is in removal proceedings can apply for DACA separately and simultaneously.[15] If that application is granted, the removal proceedings continue unless the immigration judge closes or terminates the proceedings. Further, an immigration judge has no power to grant or deny DACA, or to review or reverse USCIS' decision to deny DACA.

33.     DACA recipients are eligible to receive certain benefits. These include Social Security, retirement, and disability benefits, and, in certain states, benefits such as driver's licenses or unemployment insurance.[16]

34.     DACA also confers other advantages. For example, DACA recipients do not accrue unlawful presence under Section 212(a)(9)(B)(i) of the Immigration and Nationality Act ("INA"), 8 U.S.C. § 1182(a)(9)(B)(i), which could otherwise bar an individual from adjusting to lawful permanent resident status in the future.[17]

35.     The DACA program has been a huge success, allowing nearly 800,000 young people to go to school, advance in their careers, and serve their communities. In California alone, over 220,000 young people have benefitted from DACA.

---

[13] USCIS DACA FAQs, Question 23.
[14] USCIS DACA FAQs, Question 65.
[15] 2012 DACA Memorandum at 2.
[16] *See, e.g.*, 8 U.S.C. §§ 1611(b)(2)–(3), 1621(d).
[17] USCIS DACA FAQs, Question 5.

36.    DACA's benefits to young immigrants and the U.S. economy have been remarkable, as reported by a recent survey of DACA recipients.[18] According to the survey:

- 91 percent of respondents were employed, including at top Fortune 500 companies such as Walmart, Apple, General Motors, Amazon, JPMorgan Chase, Home Depot, and Wells Fargo.

- The average hourly wage of respondents increased by 69 percent since receiving DACA; 69 percent of survey respondents responded that their increased earnings had "helped me become financially independent" and 71 percent responded that their increased earnings had "helped my family financially." These higher wages increased tax revenues and economic growth at the local, state, and federal levels.

- 16 percent of respondents purchased their first home after receiving DACA, leading to broader positive economic effects such as job creation and the infusion of new spending in local economies.

- 94 percent reported that, because of DACA, they were able to pursue educational opportunities they could not have pursued otherwise.

Another study found that, altogether, DACA recipients stood to contribute more than $460 billion to the gross domestic product over the next ten years.[19]

37.    Not only has the program resulted in huge benefits to the American economy, but in addition, more than 86 percent of Americans support allowing DACA recipients to remain in the United States.[20]

---

[18] Tom K. Wong et al., *DACA Recipients' Economic and Educational Gains Continue to Grow*, Center for American Progress, Aug. 28, 2017, https://www.americanprogress.org/issues/immigration/news/2017/08/28/437956/daca-recipients-economic-educational-gains-continue-grow/.

[19] Nicole Prchal Svajlenka, Tom Jawetz, and Angie Bautista-Chavez, *A New Threat to DACA Could Cost States Billions of Dollars*, Center for American Progress, July 21, 2017, https://www.americanprogress.org/issues/immigration/news/2017/07/21/436419/new-threat-daca-cost-states-billions-dollars/.

[20] Scott Clement & David Nakamura, *Survey finds strong support for 'dreamers'*, Wash. Post, Sept. 25, 2017, https://www.washingtonpost.com/politics/survey-finds-

38.     After President Trump took office, his Administration continued the DACA program for more than seven months. From January to September 2017, USCIS continued to process and grant more than 250,000 new DACA applications and applications for renewals.

**The Rescission of the DACA Program**

39.     Notwithstanding the success of the DACA program and the public's overwhelming support for it, DHS announced on September 5, 2017, that it was rescinding the DACA program and winding it down.

40.     Current DACA recipients will maintain their deferred action grants and work permits until they expire. DHS will not consider new applications for DACA dated after September 5, 2017. In addition, certain individuals are eligible for two-year renewals. Individuals with a DACA grant expiring between September 5, 2017, and March 5, 2018, can apply for a two-year renewal if the application is received by October 5, 2017. Individuals whose DACA expires on or after March 6, 2018 will not have an opportunity to renew.[21]

41.     All DACA grants are expected to expire by the spring of 2020. In the meantime, hundreds of thousands of young immigrants will continue to benefit from grants of DACA and work authorization for varying lengths of time as the program winds down.

42.     Although the program is sunsetting, the Administration has confirmed on September 8, via Press Secretary Sarah Huckabee Sanders, that "[d]uring this six-month time, there are no changes that are being made to the program at this point."[22]

strong-support-for-dreamers/2017/09/24/df3c885c-a16f-11e7-b14f-f41773cd5a14_story.html?utm_term=.cea6f0719cc6.

[21] Memorandum from Acting Secretary Elaine C. Duke, Rescission of the June 15, 2012 Memorandum Entitled "Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children" (Sept. 5, 2017), https://www.dhs.gov/news/2017/09/05/memorandum-rescission-daca.

[22] *Press Briefing by Press Secretary Sarah Sanders and Homeland Security Advisor Tom Bossert, 9/8/2017, #11*, The White House, Office of the Press Secretary,

**Plaintiff Jesús Alonso Arreola Robles**

**Mr. Arreola's Life in the United States**

43.     Mr. Arreola was born in Mexico in May of 1994 and was brought to the United States by his parents in 1995, when he was only one year old. They entered without being inspected at a border crossing. He has lived in the United States continuously since his arrival—indeed, this country is the only place he can call home.

44.     Mr. Arreola attended and graduated from Los Angeles-area schools. He graduated from Lankershim Elementary School in 2005, Walter Reed Middle School in 2008, and East Valley High School in 2012. Mr. Arreola also attended a year of college at Glendale Community College, but could not continue his studies as he had to work full-time to help financially support his family.

45.     In addition to his parents, Mr. Arreola has three younger sisters, who are all U.S. citizens by birth. His oldest sister is seventeen years old. Since birth, she has had progeria, autism, Down's syndrome, and diabetes, and requires special care, around the clock, from her family members.

46.     Mr. Arreola has played a critical role in caring for his sister, including checking her blood; giving her insulin shots; helping her move around the house; and driving her to the hospital when she needs medical care. He also does everything he can to help her feel "normal," comfortable, and loved.

47.     Although Mr. Arreola's parents entered the United States without inspection, they now have lawful permanent resident status, having obtained immigration relief in the form of cancellation of removal under 8 U.S.C. § 1229a(b).

48.     Mr. Arreola is the only member of his family without permanent lawful immigration status in the United States.

---

https://www.whitehouse.gov/the-press-office/2017/09/08/press-briefing-press-secretary-sarah-sanders-and-homeland-security.

**Mr. Arreola's Grant and Renewals of DACA**

49.     Based on the government's assurances that confidential information would not be used to remove DACA recipients, Mr. Arreola first applied for deferred action and employment authorization pursuant to DACA in August 2012. As part of this process, Mr. Arreola provided the government with his school records and information about where he lived. He was also required to attend a biometrics appointment so that USCIS could take his fingerprints and photographs.

50.     Mr. Arreola was granted DACA and work authorization on September 26, 2012. Mr. Arreola's initial DACA grant remained in effect for two years, until September 25, 2014.

51.     In 2014 and again in 2016, Mr. Arreola reapplied for DACA, and each time was granted deferred action and work authorization after being subject to rigorous vetting. As part of this process, the government sent Mr. Arreola approval notices informing him that his request for deferred action had been granted.

52.     Mr. Arreola's 2016 approval notice provides that "[u]nless terminated, this decision to defer removal action will remain in effect for 2 years" and is valid until August 19, 2018. The approval notice informed Mr. Arreola that his deferred action could be terminated if he engaged in "[s]ubsequent criminal activity."

53.     Since he was granted DACA, Mr. Arreola has used his work authorization to help his family by working two jobs. Starting in approximately 2013, he worked at the Chateau Marmont in West Hollywood, first as a dishwasher and then as a cook. In April 2016, he also began working as a driver for Uber and Lyft.

54.     The money Mr. Arreola obtained from these jobs helped his family in many ways. Mr. Arreola shared his earnings and paid half the rent for the family home.

55.     Until his DACA grant and employment authorization were unlawfully revoked, Mr. Arreola had been a model employee at the Chateau Marmont and a successful driver for Uber and Lyft.

56.     Mr. Arreola has never been charged with or convicted of any crime.

13

**Mr. Arreola's Arrest and Detention**

57.     As a driver, Mr. Arreola regularly provided rides to customers for a fee, both through the Uber and Lyft apps and through referrals from friends. On February 11, 2017, a friend offered Mr. Arreola $600 to drive his cousin from the Los Angeles area to the San Diego area to pick up the friend's uncle and another cousin, and bring them back to the Los Angeles area.

58.     Mr. Arreola agreed to the long-distance ride and picked up his customer—his friend's cousin—in Sun Valley near North Hollywood. The customer entered an address near San Diego into Mr. Arreola's GPS and told him to drive to that location. Being unfamiliar with the San Diego area, Mr. Arreola did not know anything about the destination address and merely followed the GPS instructions.

59.     After driving for about three and a half hours, Mr. Arreola and his customer reached the destination either late in the evening on February 11, 2017 or early the next morning.

60.     His customer told Mr. Arreola to stop the car and wait while he went to get the uncle and cousin.

61.     The customer exited the car and walked toward a figure who was standing in the dark, who he apparently thought was the uncle. Instead of the uncle, that individual was a CBP agent. The CBP agent arrested the customer.

62.     Although Mr. Arreola informed the CBP agent that he had been granted DACA and had permission to live and work in the United States, the CBP agent also arrested Mr. Arreola, apparently suspecting that he was aiding in smuggling individuals into the United States.

63.     The CBP agent brought Mr. Arreola to Forest Gate Processing Center in Campo, California, where Mr. Arreola's property was confiscated, including his car and cell phone.

64.     Mr. Arreola was subsequently detained and questioned by another CBP agent. Mr. Arreola also informed that CBP agent of his valid DACA grant.

14

65.     The CBP agent questioned Mr. Arreola about his trip. Mr. Arreola explained that he was a driver, and that he had been offered $600 to pick up his friend's uncle and cousin near the San Diego area and drive them back to the Los Angeles area. Mr. Arreola explained that he had never met his customer before that day.

66.     Mr. Arreola did not know the immigration status of his friend's uncle and cousin whom he was supposed to pick up. As a driver, it was not Mr. Arreola's practice to ask about the immigration status of the individuals to whom he gave rides.

67.     Nonetheless, the CBP agents refused to release Mr. Arreola from custody.

68.     Instead, on February 12, 2017, CBP issued Mr. Arreola a Notice to Appear ("NTA"), initiating removal proceedings against him and charging him as removable because he was present in the United States without admission under INA § 212(a)(6)(A)(i), 8 U.S.C. § 1182(a)(6)(A)(i).

69.     Mr. Arreola was never charged with any smuggling-related crime or any smuggling-related ground of removability.

70.     For the first two days of his detention, Mr. Arreola was not allowed to make a phone call. His family had no knowledge of his whereabouts and became very worried about him. Subsequently, Mr. Arreola was transferred to multiple detention centers in California, Arizona, and Georgia, eventually ending up in Folkston, Georgia—nearly 2,500 miles away from his home.

71.     On March 2, 2017, Mr. Arreola finally received a bond hearing before an immigration judge. During the bond hearing, the ICE attorney questioned Mr. Arreola at length regarding the circumstances that led to his arrest by CBP. The ICE attorney suggested that Mr. Arreola was a danger to the community because he attempted to smuggle people into the United States.

72.     At the hearing, Mr. Arreola testified that he was a driver for Uber and Lyft, and that he was offered $600 by his friend to pick up his friend's uncle and cousin near the San Diego area and drive them back to the Los Angeles area. He further testified that he had no knowledge of the immigration status of the individuals he was supposed to

pick up, and denied the ICE attorney's allegations that he was involved with smuggling.

73.    The immigration judge rejected the ICE attorney's arguments, found Mr. Arreola credible, determined that he is not a flight risk or danger to the community, and ordered Mr. Arreola's release on $2,500 bond.

74.    The immigration judge stated that he was "not going to accept the conclusions" by the CBP agents that Mr. Arreola was involved in "smuggling aliens for financial gains." The immigration judge observed that Mr. Arreola is "an Uber and Lyft driver. He's in Hollywood, some three, three and a half hours away. Somebody is going to pay him to go all that way and come back." The immigration judge added that the CBP agents made the incorrect "assumption that [Mr. Arreola] was being paid to smuggle" the uncle and cousin "as opposed to pick up a fare, what would have been a lucrative fare."

75.    On March 3, 2017, Mr. Arreola posted bond and was released from detention. Mr. Arreola was detained a total of 21 days. He has been living in the Los Angeles area since being released.

**Termination of Mr. Arreola's DACA Grant and Employment Authorization**

76.    On March 6, 2017, Mr. Arreola received a Notice of Action from USCIS notifying him that his DACA and EAD were "terminated *automatically* as of the date [his Notice to Appear] was issued."[23] The Notice of Action states that an "appeal or motion to reopen/reconsider this notice of action may not be filed."

77.    Mr. Arreola was never provided with any prior notice that Defendants intended to terminate his DACA and EAD, nor was he provided any opportunity to respond to such a notice or otherwise contest the termination of his DACA or EAD. Neither was he provided with a reasoned explanation for the decision.

---

[23] U.S. Citizenship and Immigration Servs., Notice of Action to Jesus Alonso Arreola Robles Re I-821D, Deferred Action for Childhood Arrivals (Mar. 6, 2017) (hereinafter "Notice of Action") (emphasis added).

78.     Defendants failed to provide Mr. Arreola with any notice or process even though the DACA program rules, including the Standard Operating Procedures ("SOPs") that govern the DACA program, require that advance notice and an opportunity to respond be provided in most termination cases. Further, although the SOPs envision certain circumstances in which terminations might occur without notice, Defendants failed even to follow the procedures governing such terminations.

79.     On March 17, 2017, Mr. Arreola's counsel submitted a letter to USCIS requesting that USCIS reopen and reconsider the termination of his DACA and EAD.

80.     On May 9, 2017, USCIS responded, declining to revisit the issue. USCIS stated that, among other things, that "when ICE issues and serves the Notice to Appear on the DACA requestor during the DACA validity period, that action alone terminates the DACA. USCIS will send a Notice of Action and update our system as Deferred Action Terminated but that is only as a follow up to ICE's action of termination." However, Mr. Arreola's NTA was issued by CBP, not ICE.

81.     Mr. Arreola has suffered and continues to suffer significant and irreparable harm as a result of Defendants' actions. After his 21-day detention and subsequent release, Mr. Arreola has been unable to fully piece his life back together. After Mr. Arreola lost his DACA and work authorization, he lost his job with Chateau Marmont, and is no longer able to work as a driver for Lyft or Uber.

82.     The revocation of Mr. Arreola's DACA and work permit have been particularly difficult for him given that he and his long-term partner are expecting their first child together later this year. However, because of Defendants' actions, Mr. Arreola's ability to save for his new family has been curtailed.

83.     Defendants' termination of Mr. Arreola's DACA grant and work permit failed to comply with the DACA program rules and procedures, and violated the Administrative Procedures Act and the Due Process Clause of the Fifth Amendment.

**Plaintiff Inland Empire – Immigrant Youth Collective**

84.     The Inland Empire – Immigrant Youth Collective is a grassroots, immigrant youth-led organization located in Ontario, California. IEIYC serves the immigrant community in the Inland Empire region, which encompasses Riverside and San Bernardino Counties. IEIYC's mission is to advocate for the needs of the undocumented immigrant community in the Inland Empire, including equal access to higher education for undocumented youth, and to achieve justice for immigrant communities by empowering those most affected by immigration policy. Since 2010, IEIYC has focused its efforts on creating a safe space for undocumented youth to share resources; organizing other youth to educate and mobilize their peers; and advocating for regional, state, and federal policies that benefit immigrant communities, including DACA recipients.

85.     Since 2012, IEIYC has coordinated numerous DACA workshops during which approximately 5,000 individuals have received immigration consultation and assistance with their DACA applications. IEIYC has provided approximately 30 scholarships to immigrant youth since 2015, for a total of about $15,000, to help undocumented youth pursue their educational goals or to assist with the cost of DACA application fees. In addition, IEIYC recently raised another $15,000 to assist individual DACA applicants with their renewal fees. IEIYC also runs a Mentorship Academy for local high school and college students, including DACA recipients, to provide professional and leadership development training. In addition, IEIYC has held informational sessions on topics important to DACA recipients, such as their legal rights when encountering law enforcement, and puts on an annual health conference to provide health information and resources. IEIYC also assists in documenting and responding to immigration enforcement activities in the Inland Empire and collaborates with other local organizations to ensure a rapid response from the community.

86.   IEIYC currently has approximately 28 active members in Riverside and San Bernardino Counties, including a staff of three part-time employees and a board of directors comprised of five individuals. In various locations throughout the Inland Empire, IEIYC's members help plan events and other programming, conduct outreach, and attend membership meetings. Because IEIYC only has three part-time staff, it is heavily dependent on its members' ability to contribute their time and efforts.

87.   At least 18 of IEIYC's members are current DACA recipients who also have work authorization through the program (collectively "IEIYC DACA recipients"). Defendants' unlawful termination policies and practices are likely to harm IEIYC DACA recipients. IEIYC DACA recipients live, work, attend school, and carry out IEIYC work throughout the Inland Empire, where there is a significant CBP presence. For example, there are three CBP sub-stations in Riverside County, located in Murrieta, Temecula, and Indio, and a new Border Patrol complex is under construction in the Moreno Valley of Riverside County. There are CBP checkpoints located in Riverside County, and roving CBP patrols are also common in the area. IEIYC DACA recipients are at risk of coming into contact with CBP officers and being screened for possible revocation of their DACA when carrying out their day-to-day activities.

88.   Some of IEIYC's DACA recipients have had or may in the future have contact with local law enforcement, which could also put them at even greater risk of having their DACA terminated under the challenged practices, even though they have not engaged in any disqualifying conduct.

**Defendants' Unlawful DACA Revocation Practices**

89.   Notwithstanding President Trump's claims that DACA recipients "have nothing to worry about,"[24] Defendants have engaged in a widespread practice of unlawfully

---

[24] @realDonladTrump, TWITTER (Sept. 7, 2017, 6:42 AM), https://twitter.com/realDonaldTrump/status/905788459301908480.

revoking individuals' DACA grants and work permits without process, apparently based on unsubstantiated suspicions of criminal activity or minor criminal history, even though these individuals have not violated the terms of the program and continue to be eligible for it.

90.    The targeting of DACA recipients for revocation has coincided with broader changes in immigration enforcement under the Trump Administration. Administration officials have made numerous public statements indicating that "*anyone* who is in this country in violation of immigration law is subject to possible arrest."[25]

91.    In April 2017, in response to questions about a DACA recipient who was removed from the country, Attorney General Jeff Sessions said, "We can't promise people who are here unlawfully that they're not going to be deported."[26]

92.    In June 2017, Defendant Homan said, "If you're in this country illegally, and you committed a crime by entering this country, you should be uncomfortable . . . . You should look over your shoulder."[27]

93.    In August 2017, ICE spokeswoman Sarah Rodriguez confirmed that "ICE does not exempt classes or categories of removable aliens from potential enforcement. All of those in violation of the immigration laws may be subject to immigration arrest, detention and, if found removable by final order, removal from the United States."[28]

[25] Brenda Gazzar, *ICE arrests increase under Trump showing 'gloves are being taken off,'* The Mercury News, May 10, 2017 (quoting ICE spokesperson Virginia Kice), http://www.mercurynews.com/2017/05/10/ice-arrests-increase-under-trump-showing-gloves-are-being-taken-off-4/.

[26] Ted Hesson, *Sessions: 'We can't promise' Dreamers won't be deported,'* Politico, Apr. 19, 2017, http://www.politico.com/story/2017/04/jeff-sessions-dreams-deported-237369.

[27] Maria Sacchetti, *ICE chief tells lawmakers agency needs much more money for immigration arrests*, Wash. Post, June 13, 2017, https://www.washingtonpost.com/local/social-issues/ice-chief-tells-lawmakers-agency-needs-much-more-money-for-immigration-arrests/2017/06/13/86651e86-5054-11e7-b064-828ba60fbb98_story.html?utm_term=.abf9e8bb63d0.

[28] Tal Kopan, *ICE: Arrests still up, deportations still down*, CNN, Aug. 11, 2017, http://www.cnn.com/2017/08/11/politics/trump-administration-

94.     In September 2017, Defendant Duke reportedly stated that she has never seen DHS guidance telling DACA applicants that their information would not be used for immigration enforcement purposes.[29]

95.     Multiple DACA recipients have been detained by immigration authorities since President Trump took office. For example, in February, immigration authorities detained Josue Romero, a 19-year-old DACA recipient and arts scholarship student residing in Texas, after he was arrested by local police on a misdemeanor charge.[30]  In August, ICE apprehended 22-year-old Riccy Enriquez Perdomo, a DACA recipient, mother of two young children, and former Amazon employee residing in Kentucky. Although she had no criminal history and a valid DACA grant, immigration authorities nonetheless confiscated her work permit and detained her for a week after she went to an immigration detention center to post a bond for a friend.[31] Just recently, in early September, ten DACA recipients were detained for hours by CBP at a checkpoint in Texas even though they have valid DACA.[32] Although they were ultimately released, CBP scrutinized their records, presumably looking for a reason to hold them and revoke their DACA.

96.     Indeed, immigration officers have been expressly instructed to screen any DACA recipient they encounter in the field for potential enforcement actions. A

---

deportations/index.html.

[29] @joshgerstein, TWITTER (Sept. 27, 2017, 8:18 AM), https://twitter.com/joshgerstein/status/913060287212933120.

[30] Tom Dart, *Second known Daca recipient detained by immigration officials in Texas*, The Guardian, Feb. 16, 2017, https://www.theguardian.com/us-news/2017/feb/16/daca-dreamer-detained-immigration-texas-josue-romero.

[31] Mark Curnutte, *This immigrant mom had a permit to work at Amazon, now U.S. agents hold her in jail*, Cincinnati.com, August 23, 2017, http://www.cincinnati.com/story/news/2017/08/23/ice-detains-young-nky-mother-legal-status/593734001/.

[32] Lorenzo Zazueta-Castro, *UPDATED: Family, Immigration Attorney: DACA Recipients Being Held at Checkpoint*, The Monitor, Sept. 11, 2017, http://www.themonitor.com/news/article_1ced27f4-970e-11e7-a609-47c4564b53ec.html.

September 6, 2017 CBP memorandum directs that, after encountering a DACA recipient, immigration agents must run various systems checks to determine "whether removal proceedings are appropriate."[33] Specifically, "[w]here an agent finds derogatory information indicating that deferred action under DACA may no longer be appropriate, the agent should contact USCIS to determine if the deferred action can be terminated immediately."[34] Consistent with this directive, a CBP official in Arizona confirmed that DACA recipients whom officers encounter are screened through databases and may be detained for several hours while being screened. If the officers find an indication of a new conviction, or even simply an arrest, they may place the DACA recipient in removal proceedings, thereby revoking their DACA grants.

97.     According to government data, DACA revocations increased by 25 percent after President Trump's inauguration.[35]

98.     Upon information and belief, since January, there have been numerous cases in which immigration authorities have targeted DACA recipients by revoking their DACA grants and work permits, without providing any notice or process, even though they have engaged in no disqualifying conduct and continue to be eligible for the program. Indeed, Plaintiffs' counsel are aware of more than a dozen cases nationwide.

99.     For example, in February, immigration authorities arrested and detained 23-year-old Daniel Ramirez Medina, a Washington state resident. ICE issued him an NTA, even though he had valid DACA and had done nothing to change his eligibility for the program. Although he has no criminal history, immigration authorities claimed

---

[33] @ValOnTheBorder, TWITTER (Sept. 25, 2017, 7:35PM), https://twitter.com/ValOnTheBorder/status/912505757958119426; *see also* Valerie Gonzalez, "Border Patrol Memo States Procedures to Process All DACA Recipients," KRGV.com, Sept. 25, 2017, http://www.krgv.com/story/36450600/border-patrol-memo-states-procedures-to-process-all-daca-recipients.

[34] ValOnTheBorder, TWITTER (Sept. 25, 2017, 7:35PM).

[35] Keegan Hamilton, *Targeting Dreamers*, Vice News, Sept. 8, 2017, https://news.vice.com/story/ice-was-going-after-dreamers-even-before-trump-killed-daca.

that he was suspected of being a gang member and issued him an NTA. An immigration judge determined that he is not a flight risk or danger to the community, and ordered him released on bond, but USCIS had already revoked his DACA, without notice or opportunity to be heard.[36]

100.   In April, immigration authorities detained a 26-year-old DACA recipient in Georgia and issued him an NTA after he was arrested on a misdemeanor charge. Although the prosecutor subsequently dropped the charge and an immigration judge ordered the DACA recipient released on bond, USCIS had already revoked his DACA, without notice or an opportunity to be heard.

101.   In May, immigration authorities arrested and detained a 19-year-old DACA recipient in North Carolina and issued him an NTA after he was arrested on a misdemeanor charge. He pled guilty to a minor misdemeanor that did not disqualify him from DACA, but USCIS had already revoked his DACA, without notice or an opportunity to be heard.

102.   In May, USCIS also revoked the DACA grant and work permit of then-28-year-old Georgia resident and paralegal Jessica Colotl without notice, denying her renewal request and denying her an opportunity to be heard. Federal authorities publicly stated that the revocation was based on minor, non-disqualifying criminal history—namely, driving without a license—that Ms. Colotl had disclosed in her prior DACA applications.

103.   In June, immigration authorities arrested and detained a 22-year-old DACA recipient in California for twelve days. ICE issued him an NTA, even though he had valid DACA and had done nothing to change his eligibility for the program. Although immigration authorities later claimed that he was suspected of being affiliated with a gang, ICE voluntarily released him from detention and cancelled his removal

---

[36] Emily Goldberg, *What Immigration Raids Mean for Students*, The Atlantic, Feb. 17, 2017, https://www.theatlantic.com/education/archive/2017/02/why-was-a-daca-recipient-detained-by-ice/517134/.

proceedings, indicating that the suspicion was not substantiated. However, USCIS had already revoked his DACA, without notice or an opportunity to be heard.

104.   In July, USCIS revoked the DACA grant and work permit of a 32-year-old South Dakota resident without notice or an opportunity to be heard, despite granting him a two-year renewal only seven months before in December 2016. Federal authorities did not provide a clear reason for revoking his DACA, even though he has only a single, non-disqualifying misdemeanor conviction that he had disclosed in his prior DACA applications.

105.   In September, USCIS revoked the DACA grant and work permit of a 30-year-old Minnesota resident and mother without notice or an opportunity to be heard. Federal authorities did not provide a clear reason for revoking her DACA, even though she remains eligible for the program and her only contact with law enforcement is limited to minor traffic violations.

106.   In addition, thousands of individuals nationwide are subject to having their DACA and work authorization terminated pursuant to Defendants' unlawful policies and practices.

107.   Defendants' unlawful termination of qualified individuals' DACA and work authorization involves three systemic practices.

108.   *First*, Defendants have a practice of revoking DACA grants without providing notice, a reasoned explanation, or an opportunity to be heard prior to revocation, and without providing a process for reinstatement where the revocation is in error.

109.   *Second*, Defendants have engaged in a widespread practice of automatically terminating DACA grants and work permits of individuals who remain eligible for DACA based on the filing of a Notice to Appear by immigration authorities, including where the sole basis for the NTA is the individual's presence without admission in the United States or having overstayed a visa—charges that apply essentially to all DACA recipients—and even though DACA is available to noncitizens who are already in removal proceedings.

110.    *Third*, Defendants have targeted DACA recipients for revocation, even though they have committed no disqualifying conduct, based on the Trump administration's articulation of new immigration enforcement priorities. On February 20, 2017, former DHS Secretary Kelly issued a memorandum setting forth priorities for DHS's enforcement of the immigration laws.[37] The Memorandum prioritizes for removal even noncitizens who have no criminal convictions, but merely have been "charged with any criminal offense that has not been resolved," as well as any noncitizen who has "committed acts which constitute a chargeable criminal offense." These broad categories presume guilt for offenses that have not been proven in court. They also include minor misdemeanors that do not disqualify individuals from the DACA program, such as traffic offenses or crimes related to immigration status like unlawful entry into the United States.

111.    Although the Kelly Memorandum rescinded prior guidance concerning immigration enforcement priorities issued during the Obama administration, it expressly kept the DACA guidance in place. Thus, the Memorandum provides that "the Department no longer will exempt classes or categories of removable aliens from potential enforcement" "*[e]xcept as specifically noted above*"—referring specifically to the DACA program.[38] DHS also issued a "Q&A" document concerning this memorandum which states (at Question 22):

> Q22: Do these memoranda affect recipients of Deferred Action for Childhood Arrivals (DACA)?
>
> A22: No.[39]

---

[37] *See* Memorandum from John Kelly, Enforcement of the Immigration Laws to Serve the National Interest 2 (Feb. 20, 2017), https://www.dhs.gov/sites/default/files/publications/17_0220_S1_Enforcement-of-the-Immigration-Laws-to-Serve-the-National-Interest.pdf.

[38] *See id*.

[39] *See Q&A: DHS Implementation of the Executive Order on Enhancing Public Safety in the Interior of the United States*, Dep't of Homeland Sec., Feb. 21, 2017, https://www.dhs.gov/news/2017/02/21/qa-dhs-implementation-executive-order-

112.   Notwithstanding the express language in the Kelly Memorandum and the accompanying FAQ, immigration authorities have claimed that the Kelly Memorandum justifies revoking the DACA grant of individuals who would fall within the new, extremely broad enforcement priorities. Immigration authorities have taken this position even though the rules of the DACA program expressly provide that certain minor criminal history is not disqualifying. Under Defendants' view, apparently any DACA recipient who is charged with or has allegedly committed *any* criminal offense, no matter how minor, and without any conviction, can have his or her DACA grant and work permit stripped without notice.

113.   Defendants' policies and practices violate the Administrative Procedures Act ("APA") and the Due Process Clause of the Fifth Amendment to the U.S. Constitution.

114.   Defendants' failure to provide DACA recipients with notice, a reasoned explanation, and an opportunity to be heard prior to revocation, as well as a process for reinstatement where the revocation is in error, violates the Due Process Clause and the rules governing the DACA program, and is arbitrary and capricious and contrary to law in violation of the APA. Individuals who have been granted DACA have important constitutionally protected interests in their DACA grant and employment authorization. The revocation of an individual's grant of deferred action and work permit under the DACA program harms those interests. Before the immigration authorities may revoke a DACA grant and work permit, they must provide, at a minimum, notice, a reasoned explanation for the decision, and an opportunity to be heard. This is particularly important where immigration authorities seek revocation based on mere allegations. In addition, the rules for the DACA program require that detailed procedures be followed before a DACA grant can be terminated, including

enhancing-public-safety-interior-united-states.

1    notice and an opportunity to respond in most cases. Yet Defendants fail even to follow

2    their own procedures.

3    115.   In addition, Defendants' practice of automatically terminating DACA when

4    immigration authorities file a Notice to Appear—including based solely on presence

5    without admission to the United States or overstaying a visa—is arbitrary and

6    capricious and contrary to law in violation of the APA. An individual's presence

7    without admission or overstay of a visa does not provide a relevant basis for

8    terminating DACA. Defendants' practice of terminating DACA based on an NTA

9    charging presence without admission or overstaying a visa is irrational and arbitrary

10   because all DACA recipients are present in the country without lawful immigration

11   status; indeed that circumstance is what made it necessary for them to apply for

12   DACA in the first place. Further, the practice is contrary to the rules for the DACA

13   program, which do not allow for termination based merely on presence without

14   admission or overstaying a visa, and also do not permit automatic termination unless

15   certain procedures are followed. Indeed, Defendants' own rules expressly provide that

16   individuals who are in removal proceedings, or who have received a final order of

17   removal, remain eligible to apply for and receive DACA. Defendants' practice is also

18   unlawful because, in automatically revoking DACA based on an NTA, the agency

19   fails to consider the relevant facts and circumstances and exercise individualized

20   discretion in deciding whether to continue or revoke DACA. In addition, Defendants'

21   practice improperly rests the decision of whether an individual's DACA grant

22   continues to be warranted on the capricious charging decision of an individual

23   immigration agent. For these reasons and others, Defendants' automatic termination of

24   DACA based on an NTA is unlawful.

25   116.   Further, Defendants' practice of revoking DACA for individuals who lack any

26   disqualifying criminal convictions without process is unlawful under the APA because

27   it reflects the agency's reversal of its decision to grant DACA in the first place,

28   without providing a reasoned explanation for the change. The granting and renewal of

27

DACA reflects the agency's reasoned determination that the individual is eligible for and deserving of deferred action and work authorization. A revocation reflects an abrupt change in the agency's considered position, yet the agency's practice is to revoke DACA in these cases without providing a reasoned explanation that would justify such a change.

117. Finally, Defendants' reliance on the Kelly Memorandum to terminate DACA for individuals who have committed no disqualifying conduct and continue to be eligible for the DACA program is arbitrary and capricious and contrary to law in violation of the APA because it violates Defendants' own rules for the DACA program, and is inconsistent with the express language of the Kelly Memorandum. Indeed, applying DHS' new enforcement priorities to DACA recipients would eviscerate the DACA program as DACA recipients by definition lack a lawful immigration status, and a large number of them have engaged in activities related to their lack of status—such as entering the country without authorization or driving without a license—that would make them an immigration enforcement priority were the Memorandum to apply to them.

## CLASS ALLEGATIONS

118. Together with IEIYC, representative Plaintiff Arreola brings this action pursuant to Federal Rules of Civil Procedure 23(b)(2) on behalf of himself and a nationwide class of all other persons similarly situated. The proposed class is defined as follows:

> All recipients of Deferred Action for Childhood Arrivals ("DACA") who have had or will have their DACA grant and employment authorization revoked without notice or an opportunity to respond, even though they have not been convicted of a disqualifying criminal offense.

119. The class satisfies the requirements of Rule 23(a)(1) because it is so numerous that joinder of all members is impracticable. Plaintiffs' counsel alone are currently

aware of at least a dozen individuals across the country who have had their DACA and work authorization revoked without any process, even though they lack a disqualifying conviction. Moreover, many more such individuals will continue to have their DACA and work authorization revoked without process in the future, making joinder impracticable. Indeed, thousands of current DACA recipients nationwide are subject to having their DACA and work authorization revoked pursuant to Defendants' policies and practices, without notice or an opportunity to respond to Defendants' allegations, even though they remain eligible for the program.

120.    The class meets the commonality requirements of Federal Rule of Civil Procedure 23(a)(2). The proposed class members are all subject to Defendants' three common practices or policies: (1) the revocation of DACA and work authorization without notice, a reasoned explanation, and an opportunity to be heard prior to revocation, or a process for reinstatement where the revocation is in error; (2) the automatic termination of DACA grants and work permits based on the filing of a Notice to Appear, even where the sole basis for the NTA is presence in the country without admission or overstaying a visa; and (3) the termination of DACA grants and work permits based on DHS' new immigration enforcement priorities, even where an individual has no disqualifying conviction. The lawsuit raises numerous questions of law and fact common to members of the class, including but not limited to:

- Whether Defendants' practice of revoking DACA without notice, a reasoned explanation of the reason for such termination, or an opportunity to be heard is arbitrary and capricious and contrary to law in violation of the APA;

- Whether Defendants' practice of revoking DACA without notice, a meaningful explanation of the reason for such termination, or an opportunity to be heard violates the Due Process Clause.

- Whether Defendants' practice of automatically terminating DACA when immigration authorities file a Notice to Appear—including based solely on

presence without admission to the United States or overstaying a visa—is arbitrary and capricious and contrary to law in violation of the APA.

- Whether Defendants' practice of terminating DACA based on criminal history or alleged conduct, even though the individual remains eligible for the program, pursuant to the immigration enforcement priorities set forth in the Kelly Memorandum, is arbitrary and capricious and contrary to law in violation of the APA.

121. The proposed class meets the typicality requirements of Federal Rule of Civil Procedure 23(a)(3) because the claims of the representative Plaintiff, Mr. Arreola, are typical of the claims of the class. Mr. Arreola and the proposed class members are all individuals who are or will have their DACA and employment authorization revoked without notice or an opportunity to be heard even though they have not been convicted of a disqualifying criminal offense, and are all subject to Defendants' practice of terminating DACA and employment authorization based on the filing of an NTA and/or the Kelly Memorandum. Plaintiff Arreola and the proposed class also share the same legal claims, which challenge the legality of these revocation policies and practices under the APA and the Due Process Clause.

122. The proposed class meets the adequacy requirements of Federal Rule of Civil Procedure 23(a)(4). Mr. Arreola seeks the same relief as the other members of the class—namely, a declaration that Defendants' policies and practices violate the APA and Due Process Clause, and an order enjoining Defendants from terminating DACA and work authorization on arbitrary grounds and in the absence of adequate procedures. Moreover, Mr. Arreola has no interests adverse to those of the class as a whole. In defending his own rights, Mr. Arreola will defend the rights of all proposed class members fairly and adequately.

123. In addition, the proposed class is represented by counsel from the American Civil Liberties Union Immigrants' Rights Project and the American Civil Liberties Union of Southern California. Counsel have extensive experience litigating class

action lawsuits and other complex cases in federal court, including civil rights lawsuits on behalf of noncitizens.

124.   The members of the class are readily ascertainable through Defendants' records.

125.   Finally, the proposed class satisfies Federal Rule of Civil Procedure 23(b)(2). The immigration authorities have acted on grounds generally applicable to the class by arbitrarily stripping class members of DACA and employment authorization, without adequate procedures through which they can challenge those revocation decisions. Thus, final injunctive and declaratory relief is appropriate with respect to the class as a whole.

## CLAIMS FOR RELIEF

### First Claim
### Administrative Procedure Act

126.   The foregoing allegations are repeated and incorporated as though fully set forth herein.

127.   The Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701-706, provides that courts "shall . . . hold unlawful and set aside agency action" that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

128.   Defendants' practice of terminating or revoking DACA grants and employment authorization without notice, a reasoned explanation, an opportunity to be heard, or a reinstatement procedure is arbitrary, capricious, and contrary to law in violation of the APA because a DACA grant cannot be terminated without first providing a meaningful process and complying with the DACA program rules, including the SOPs.

129.   Defendants' practice of automatically terminating or revoking DACA and employment authorization as a result of the filing of an NTA—including a NTA solely charging removability for being present without admission or for having overstayed a visa—is arbitrary, capricious, and contrary to law in violation of the

APA for multiple reasons, including that such an NTA fails to provide a reasoned basis for terminating DACA; terminating on this basis is inconsistent with the rules of the DACA program; the practice reflects a failure of the agency to exercise individualized discretion; and it rests the termination decision on the arbitrary charging decision of an ICE or CBP officer.

130.   Defendants' practice of terminating or revoking DACA based on non-disqualifying criminal history or unsubstantiated allegations is arbitrary and capricious and contrary to law in violation of the APA because it represents a departure from the agency's considered decision to grant DACA, without providing a reasoned explanation for their change in position.

131.   Defendants' practice of relying on the Kelly Memorandum to terminate or revoke DACA for individuals who have committed no disqualifying conduct and continue to be eligible for the DACA program is arbitrary and capricious and contrary to law in violation of the APA because it is contrary to Defendants' own rules for the DACA program, as well as the language of the Kelly Memorandum itself.

**Second Claim**
**Due Process Clause of the Fifth Amendment to the U.S. Constitution**

132.   The foregoing allegations are repeated and incorporated as though fully set forth herein.

133.   The Due Process Clause of the Fifth Amendment to the U.S. Constitution provides that "[n]o person shall be . . . deprived of life, liberty, or property, without due process of law." U.S. Const. amend. V.

134.   Defendants have a policy and practice of revoking DACA recipients' DACA and work authorization without providing any process. Once DACA has been granted, it cannot be taken away without adequate process. Defendants' policy and practice violates procedural due process because it fails to provide DACA recipients with notice, a reasoned explanation for the revocation decision, and an opportunity to respond, and to present arguments and evidence to demonstrate that the individual

continues to be eligible for and warrants the continuation of his or her DACA grant. Defendants' process also fails to provide for reinstatement in cases where the revocation decision was in error.

## PRAYER FOR RELIEF

IEIYC and Mr. Arreola, on behalf of himself and others similar situated, ask this Court to grant the following relief:

a) Certify this case as a class action lawsuit as proposed herein, appoint Mr. Arreola as class representative and the undersigned counsel as class counsel;

b) Declare Defendants' DACA revocation practices and policies unlawful and unconstitutional;

c) Enjoin Defendants from terminating class members' and IEIYC DACA recipients' DACA grants and EADs absent a fair procedure—including reasonable notice, a reasoned explanation, and an opportunity to be heard—through which to challenge the termination consistent with the APA and the Due Process Clause;

d) Enjoin Defendants from revoking the DACA grants and EADs of class members and IEIYC DACA recipients based on the filing of an NTA charging solely presence without admission to the United States or overstaying a visa, or based on the enforcement priorities set forth in the Kelly Memorandum;

e) Vacate Defendants' unlawful revocation of DACA and work authorization for Mr. Arreola and class members, and enjoin Defendants from enforcing the revocations;

f) In the alternative, order Defendants to temporarily reinstate DACA and work authorization for Mr. Arreola and such class members pending a fair procedure—including reasonable notice, a reasoned explanation, and an opportunity to be heard—through which they may challenge the revocation decision consistent with the APA and the Due Process Clause;

1     g) Order Defendants to accept renewal applications from Mr. Arreola and class

2        members whose DACA protections were unlawfully revoked;

3     h) Grant an award of attorneys' fees and costs; and

4     i) Grant any other and further relief that this Court may deem fit and proper.

5

6                                    Respectfully submitted,

7
        Dated:  October 5, 2017        /s/ Jennifer Chang Newell
8                                      Jennifer Chang Newell
9                                      Katrina L. Eiland
                                       Michael K. T. Tan
10                                     David Hausman
11                                     ACLU FOUNDATION
                                       IMMIGRANTS' RIGHTS PROJECT
12
13                                     Ahilan T. Arulanantham
                                       Dae Keun Kwon
14                                     ACLU FOUNDATION
                                       OF SOUTHERN CALIFORNIA
15
16                                     *Attorneys for Plaintiffs*

17

18

19

20

21

22

23

24

25

26

27

28